# Case No. 17,895.

## WINTER et al. v. UNITED STATES.

[Hempst. 344.] [1]

District Court, D. Arkansas.   Oct., 1848.

SPANISH LAND GRANT—OPEN CONCESSION —NECESSITY OF SURVEY—IDENTIFICATION OF MONUMENTS.

1. Hearsay and reputation are not admissible to prove particular facts in a contest as to private rights, and hence proof that a stone monument was reputed to have been put down to designate a private grant, cannot be received.

2. By the laws and ordinances of Spain, and the regulations and usages of the province of Louisiana, the survey of an open concession or grant was necessary to give it locality and to perfect the title in the grantee, and without which private was not separated from public property, nor was the grant valid as against the government which made it, and hence not valid against the United States.
[Approved in De Villemont v. U. S., Case No. 3,839; Cited in Glenn v. U. S., Id. 5,481.]

3. The regulations of Count O'Reilly, of 1770; those of Gayoso, of 1797; those of Morales, of 1797; the regulations existing in Florida as to the survey of lands, and decisions of the supreme court of the United States on that subject, referred to and commented on at large.

4. A survey of lands under the Spanish government, as with us, meant and consisted in the actual measurement of land, ascertaining the contents by running lines and angles, with compass and chain; establishing corners and boundaries, and designating the same by marking trees, fixing monuments, or referring to existing objects of notoriety on the ground, giving bearings and distances, and making descriptive field notes and plots of the work [Ellicott v. Pearl] 10 Pet. [35 U. S.] 441; [U. S. v. Hanson] 16 Pet. [41 U. S.] 198.
[Cited in Muse v. Arlington Hotel Co., 68 Fed. 641.]

5. A warrant or order of survey could be executed by the surveyor-general of the province of Louisiana or by any deputy appointed by him, or by the district surveyor, or by the commandant of a post, or by a private person specially authorized by the governor general or intendant; but Spain never permitted individuals to locate their grants by mere private survey.

6. The supreme court of the United States has decided in various cases, that an actual survey of an open concession was a necessary ingredient to its validity, and that it must also have been an authorized survey to sever any land from the royal domain.   These cases cited.

7. A party is bound to abide by his own pleadings, and cannot therefore be permitted to prove any thing in opposition thereto.

8. Therefore a petition which prays for the confirmation of an indefinite grant, and shows on its face by express averment, that the same was not surveyed, presents a case in which the claim must be rejected.

9. Fixing a stone post or monument at any particular spot, with however much solemnity, was not equivalent to a survey, nor could it in the very nature of things designate any particular or specific land, and it was. therefore, an unauthorized act, not recognized by the Spanish government.

10. No usage or custom can prevail against an express law of the lawmaking power.

[1] [Reported by Samuel H. Hempstead, Esq.]

11. Under the government of Spain, as well as by the civil law, conditions in grants were required to be performed, and were not inserted as mere matters of form.

12. A grant of one million of arpens of land, at the port of Arkansas, made by the Baron de Carondelet, governor-general of Louisiana, to Elisha Winter, on the 27th of June, 1797, rejected, because the grant did not designate any particular land, and was not designated and ascertained by an authorized survey.

Petition for the confirmation of a Spanish grant, determined in the district court of the United States for the district of Arkansas, under the act of congress of the 26th of May, 1824 (4 Stat. 52), before Benjamin JOHNSON, District Judge. The facts of the case are sufficiently stated in the opinion of the court. A translation of the concession referred to in the petition and thereto attached, was as follows:

"The Baron De Carondelet, Knight of the Religious Order of St. John, Field Marshal of the Royal Armies, Governor-General and Vice Patron of the Province of Louisiana and West Florida, Inspector of the Troops of the Same, &c. Being desirous to promote the population and agriculture by all the means adapted to the political circumstances of the times, and adverting to the proposals made to the government by Elisha Winter, to the end of forming a settlement in the post of Arkansas, for the cultivation of flax, wheat, and hemp; therefore, in order to realize said object, I presently concede to said Elisha Winter one thousand arpens of land square, to William Winter five hundred arpens square, to Gabriel Winter five hundred square, and to Samuel Price, Richard Price, William Hubble, John Price, William Russell, Joseph Stetwell, and Walter Karr, fifteen arpens of land in front by forty in depth, to each of them respectively, in consideration of the good information given to me of their excellent deportment and good principles, under the express conditions, that as soon as they shall have settled themselves on their respective surveys, which the commandant of the post will cause to be executed, there shall be delivered to each one his title deed in due form; that the settlement is to be made as united and as closely connected as possible, nor are any other American families to be admitted than those above named, and such as the government may permit to settle, which permission may be given in the mean time by the commandant to the good colonists, such as Spanish, French, German, and Irish, who shall make application; but no manner of admission shall be granted to vagabonds, and for any contravention of this clause the commandant will be held responsible. Provided, that if in the term of one year the lands appropriated in this document to the families above named, respectively, are not occupied, this concession shall be void, which shall be attended to in all its parts by the commandant of the district, who is charged with the strict execution of the whole, consistent with the beneficence and humanity of the Spanish government. The present given at New Orleans, the 27th of June, 1797.

"[L. S.]          The Baron De Carondelet.
"Andrez Lopez Armisto."

Among various exceptions to testimony adduced by the petitioners, was one to the deposition of William Russell. The material parts of the deposition were as follows:—William Russell being duly sworn, says, the first time he was at the post of Arkansas, was either in 1812 or 1813; that he then heard the grants to the Winters frequently spoken of, and that it was the general understanding of the community at the post of Arkansas, that three grants, one to Elisha Winter, one to William Winter, and one to Gabriel Winter, had been made by the Spanish government; that William Winter had settled on the lands granted to him, very soon after the grant was made, and that he continued to reside on it until his death, and was buried on it. It was generally understood and reported at the post, that Elisha Winter, soon after the date of the grant, brought from Lexington, Kentucky, a hewn stone or monument, three or more feet long, and of large size, which was established under the superintendence of Don Carlos De Villemont, the then Spanish commandant of the post, in 1798, as the south-east corner of the tract granted to Elisha Winter, and as the south-west corner of the tract granted to William Winter. The place pointed out to me, as that where William Winter settled and lived and died, was north of east of the corner-stone, and one mile and a half from it. The grant to William Winter was generally understood, and reputed at the post of Arkansas, in 1812 or 1813, to lie east of that granted to Elisha Winter; that the lines of these tracts were to be run to the cardinal points, and that the line dividing them was to be run north from this corner-stone. He has heard the said Don Carlos De Villemont say, that the stone was planted with a good deal of public ceremony for the purpose of putting the grantees in possession of their lands. As to these matters he has no personal knowledge, and what he does know and states is derived from hearsay and reputation. In 1816 or 1817, he was at the said corner-stone, which had then fallen down and was lying on the ground; but it was generally said to be at the same spot where it was first set, in 1798.

To this deposition the United States, by S. H. Hempstead, district attorney, excepted on the ground that it was formed of "matters of hearsay and reputation as to particular facts, and therefore inadmissible." An exception was also taken to the statement of Don Carlos De Villemont, made before Frederick Bates in 1813, on the ground that the latter had no authority to take it.

These exceptions having been argued by Daniel Ringo, for the petitioners, and S. H.

Hempstead, Dist. Atty., for the United States, THE COURT, on the 7th of September, 1846, delivered the following opinion:—

OPINION OF THE COURT (JOHNSON, District Judge). The first exception is to the second deposition of William Russell. It is not deemed necessary to notice any other ground of exception to this deposition than the one which relates to hearsay and reputation. The court heretofore ruled in this case, that hearsay and reputation was not admissible to prove particular facts in a contest as to private rights; and it may not be improper briefly to state the reasons on which the rule is based. It is certainly a general and long established principle of the law of evidence, that hearsay and reputation is not competent to prove any fact in a court of justice. The reason is that evidence ought to be given under the sanction of an oath, and an opportunity afforded of cross-examination. It is also unquestionable, that there are some exceptions, which are probably as ancient as the rule itself, and which are allowed, either because the danger attending such evidence is not likely to occur in the excepted cases, or because greater inconvenience would result from its exclusion than its admission; and among these exceptions are questions relating to public rights. In these cases common reputation is admitted, because such rights being matters of public notoriety, and of great local importance, become a continual subject of discussion in the neighborhood, where all have the same means of information, and the same interest to ascertain the claim. 1 Phil. Ev. 248; Weeks v. Sparke, 1 Maule & S. 679; Morewood v. Wood, 14 East, 329. The boundaries of parishes or manors may be thus proved, because they are more or less of public concern; and it is not to be doubted that if a contest should arise between two states or two countries, as to boundary, general reputation would be admissible. Gris. Eq. Ev. 220. The tradition, however, of a particular fact, as that a post or stone was put down, or turf dug in a particular spot, is not competent evidence to establish a private right, because it is not a matter of public concern in which the community are interested. This rule is undoubtedly sustained by the English cases, and by the weight of authority in the American courts. 1 Phil. Ev. 250; 3 Term R. 709; 5 Term R. 123; 14 East, 330; 1 Price, 253; 1 Anstr. 298; Cherry v. Boyd, Litt. Sel. Cas. 7; Lee v. Tapscott, 2 Wash. (Va.) 276; U. S. v. Kingsley, 12 Pet. [37 U. S.] 483; Elecott v. Pearl, 10 Pet. [35 U. S.] 412. The whole object and scope of Russell's deposition is to prove matters of reputation, or the voice of common rumor, which relate to no public, but to a strictly private right. The petitioners are prosecuting a private claim in this court, in which the public are not interested in the sense contemplated by the rule as to public matters. The deposition of Russell is, in the opinion of the court, incompetent and inadmissible as evidence, and must be rejected.

The third exception is to the testimony of Don Carlos De Villemont, purporting to have been taken before Frederick Bates, as commissioner, in 1813. The main ground relied on by the district attorney to exclude this testimony is, that "the recorder of land titles, acting as commissioner. had no jurisdiction over the case, and had therefore no authority to take the testimony." By an act of congress of the 13th of June, 1812 (2 Stat. 748), power was vested in the recorder of land titles to investigate and report on certain Spanish and French claims in the state of Missouri. His authority appears to have been confined to two classes of cases; first, to the claims of persons who were then actual settlers on the land they claimed, and whose claims had not been before that time filed with the recorder of land titles. Such persons were allowed to file a notice in writing, stating the nature and extent of their claims, and the written evidences thereof, which were directed to be recorded. Second, to claims which had been presented to the board of commissioners of Missouri, but had not been decided on by that board. The recorder has authority to take testimony in these two classes of cases. 1 Land Laws, 622. Now this case could not belong to the first class; because the claimant was not then an actual settler on the land; nor did he file any notice of claim with the recorder. Nor could it belong to the second class, because, although it had been before the board of commissioners, it had been rejected by that board. It had therefore "been decided on," and whether rightfully or wrongfully, it was not his province to determine. It was certainly not the intention of congress, either by that or any subsequent law, to give him authority to reinvestigate either confirmations or rejections of claims made by the board of commissioners. Strother v. Lucas, 12 Pet. [37 U. S.] 454. This case, then, was not regularly before him; he had no jurisdiction over it for any purpose whatever, and it must therefore follow that he had no authority to take the testimony, and that it is of no more force or validity than a mere ex parte statement. It must, therefore, be excluded. The second deposition of William Russell, and the testimony of Don Carlos De Villemont, must be rejected and suppressed.

The remaining exceptions of the district attorney to the evidence adduced by the petitioners, will be reserved for decision till the final hearing of the cause. Depositions suppressed.

Samuel C. Roane and Frederick W. Trapnall appeared as counsel for the petitioners. Daniel Ringo was also of counsel for the petitioners. who argued the law and facts of the case at great length. The following is

a synopsis of his argument, and the points and authorities referred to by him:—

The grant is indisputably proven. The lands granted are at the post of Arkansas. Is not this definite? Cannot a survey be made from it? The lands were granted for settlement and agriculture, as is particularly shown on face of the grant. They were granted June 27, 1797, to be settled in one year. In the winter or spring following, all the grantees removed to the post and settled there as agricultural farmers, embarked in a business not previously followed by them, and remained there engaged in such business until at and after the United States took possession of the country, a period of seven years at least. This is proven by Stilwell and Many. Their settlement was upon the nearest vacant land to the post; the land between their settlement and the post was occupied by and granted to others. This is proven by Stilwell and Pelham. They removed there with the avowed design of settling on lands granted them by the Spanish government, and induced Stilwell to remove with them to occupy lands granted to him by the same instrument. This is proven by Stilwell. Winter procured in Kentucky, and brought with him to Arkansas, a stone two feet long, avowedly for a corner monument to the lands granted him, which, shortly after their arrival at the post, was taken to his dwelling, and thence to a place some two miles distant, and planted in the ground upright, just outside the lands granted to and occupied by others, where it has ever since remained. This is proven by Stilwell. Winter, thenceforward, claimed there the quantity of land given by said grant; his claim was notorious, and must have been known to the commandant, and he exercised acts of ownership by occupancy, and by bartering some of it with Stilwell's father. The settlement at the post consisted then of some forty or fifty families, confined within the compass of four or five miles from the post. Proven by Stilwell. Stilwell's father was put into possession of his land by the commandant; and in the same manner was every one who settled at the post invested with the land occupied by him. The grant contained an order to the commandant to put the grantees in possession of the granted lands; establish the boundaries of their lands respectively; whereupon a title deed in form should be given to each, and provided that if the lands granted were not occupied by the families named in the grant within one year, the concession should be void. Settlement on the granted lands within one year, was the only condition prescribed to the grantees; the commandant was charged with the duty of establishing the boundary, or making the surveys, and forbid to admit other Americans, not named, as settlers. This proves, incontestably, that the commandant possessed and exercised the control of the settlements made at the post,

or within his jurisdiction, allowing only such persons to settle there as he was ordered by his superior, or himself judged proper to admit, and excluded such as he was directed, or chose, from settling. Also that he prescribed to each the place of his settlement, which was to be as united and contiguous as possible; and he is commanded expressly to attend to the strict execution thereof in all its parts.

What was it that the commandant was thus enjoined to attend to, and do or see done? (1) To survey, cause to be surveyed, or establish the boundaries of the lands granted. (2) To see that each family to whom the lands were granted was established on the same within one year from the date of the grant. (3) To see that no more or other American families than those named were admitted to settle on said lands. Did he perform these orders? The Winter families and Stilwell removed to the post, and were settled and established there as early as the spring of 1798; Stilwell was formally put into possession by the commandant; the Winters at once made extensive improvements, erected permanent buildings, cleared lands, cultivated wheat, flax, hemp, and cotton; brought to the country sheep and other stock, the first that were ever there, and slaves and hired men; brought a stone to be planted as a monument on corner to the land granted, which was planted within two weeks after their arrival at a place contiguous to, but outside of the lands then occupied by others, so that a line extended west and east from it would embrace their settlement north of such line, in the quantity of lands granted to them; continued their settlement at the same place for seven years under the Spanish government, claiming the land as their private property under said grant, and that said stone had been planted by the commandant as the southeast corner of E. Winter's tract. These facts were notorious; were much talked of; were known to the various commandants, who never molested them, or denied their right, as claimed; nor did they ever complain that the commandant had not done what was required of him, nor did the governor ever complain that his orders had not been executed. The commandant was a public officer, and the law presumes that he discharged his duty, and the presumption is therefore irresistible that he established the boundary of the lands granted to Winter and his sons; that he caused said stone to be planted as a monument of such boundary; that it indicated the south-east corner of the tract of Elisha Winter; and that he saw the Winter family established on the lands so granted to them, according to his orders and the usages and customs then observed at said post. As to presumption, Hartwell v. Root, 19 Johns. 345; Ross v. Reed, 1 Wheat. [14 U. S.] 482; Frost v. Brown, 2 Bay, 133.

With this conclusion every act of the parties accords; while no one fact has been or can be adduced to militate against this presumption; let us see. The grant was made June 27, 1797. By it the commandant was required to set apart to each family the lands granted; and they were to establish themselves on the lands so granted and set apart for them respectively within one year: these facts are incontestably proven. Winter procured in Kentucky and brought to Arkansas a hewn stone of large size, two feet long,—there was no other such at or near the post,—removed to and settled at the post. The stone was set up conspicuously in the prairie immediately after. Winter claimed the land to the extent of the grant northwardly, claimed the stone as his southeast corner. All these facts were notorious at the post in 1798, and thenceforward; no one then controverted his rights as claimed. But it has been said in argument that the stone may have been planted without the authority or direction of the commandant. For what purpose? Can a rational man suppose that Winter would have procured, transported, and planted it, without any object? or that he would have planted it with the design of making title to lands not granted to him? or that the commandant would have suffered him to establish himself on the land, of which he publicly claimed this was a corner monument, and quietly occupy it for seven years under such claim, and to exercise all the acts of ownership over it? Such a supposition is directly opposed to the ordinary conduct of men, to the usages of the Spanish authorities, to the express orders to the commandant, and utterly irreconcilable with the acts and conduct of the parties, and the legal presumptions based on them. Nor could any of the parties at that period have anticipated a change of government, or acted in reference to such event; nor can it be presumed that Winter, by such conduct, could have expected to make title to or hold the lands claimed by means other than those warranted by the laws, usages, and customs then prevailing in said district; so that no possible motive for planting said stone without the direction and authority of the commandant can be conceived.

But it has been also urged that this is a general grant, which could only be so located as to sever the granted lands from the domain, and make them the property of the grantees, by an actual survey thereof, made by or under the authority of the Spanish surveyor-general. To this we reply, that the governor-general, as viceroy, possessed, in regard to the disposal of the public lands, all the powers of the king. 1 White, New Recop. pp. 367–372; 2 White, New Recop. p. 31, § 23; Id. p. 38, § 45; Id. p. 41, § 50; fee-simple right acquired in four years, Id. p. 49, § 75; grants not revoked without fault of grantee, Id. p. 99; as to mode of grants, surveys, &c., Id. p. 474; Morales's letter of Oct. 16, 1797; custom, 1 White, New Recop. p. 360, tit. 7; as to dominion, Id. p. 85, cc. 1–4, mode of acquiring, Id. 91, cc. 9–11; Id. p. 154, §§ 1–3; Id. p. 300, c. 7; Id. pp. 341–344; Smith v. U. S., 10 Pet. [35 U. S.] 326. He was neither restrained by any law or order of the king, nor could he be by any regulations of his predecessors, for his powers were equal to theirs, and he could limit or abrogate them in whole or in any particular.

In the present grant he expressly orders the commandant of the post to establish the boundaries, or cause the surveys to be made, as he had an unquestionable right to do. It is in proof that no surveyor was then in the district of Arkansas, nor any actual surveys made for years thereafter. That post was a frontier, remote from the capital and exposed to Indian depredations, and no actual survey of these lands could safely have been made; which facts were doubtless known to the governor, and fully account for the orders given by him to the commandant to establish the boundaries of the lands, or cause them to be surveyed, thus dispensing with a survey by the surveyor-general of these lands. That no survey by actual admeasurement and running and marking the lines was then made, is admitted; but that a boundary was fixed by the commandant, we insist is established: (1) By proof of the occupancy by the grantees. (2) By the planting of the stone as a monument of the boundary, and the marking of trees to indicate the boundary. (3) By the figurative plots of said tracts returned to and found in the land archives of said province and district.

The lands at the post were then in Lower Louisiana (proven by Stoddard), and the archives belonged to the office at New Orleans, the capital; and these plots were found in said archives in 1805, indorsed by Trudeau, the surveyor of said province; that they were received by him October 8, 1798, as appears by the certificate of Armesta; the same remained in the archives at New Orleans on the 1st March, 1808, as appears by the certified copies made on that day by Trudeau, the same person who had custody of the originals in 1798, and also in 1808; also in the records relating to said province taken to Florida on the surrender of Louisiana; the same evidence is found in 1808, and Trudeau, in April, 1808, again certifies that he took a copy of the original plot, and deposited the same among the archives; and the same remains in said office in 1848, as appears by the testimony and certificate of Bringier, the present depository thereof, under the authority of the state of Louisiana. In 1808, June 18, the copies of said plats, of 1st and 2d of March, were produced to the board of commissioners for Louisiana and recorded in the recorder's office established by the United States at St. Louis. At that time the whole was within the same jurisdiction; and copies from the

office at New Orleans, where the originals then were, without additional authentication, were as conclusive as the originals or protocols which by law must remain among the archives, and unless shown to be antedated or fraudulent, were conclusive. 1 White, New Recop. tit. "Proofs." Such copy, therefore, imported such verity as by law clearly entitled it to be used as evidence, and to be admitted to record by the United States recorder. Trudeau had been intrusted with the custody of these archives by the Spanish government, and they continued in his custody afterwards under the authority of the United States government; he was their lawful custodian, and he had a right, under the unaltered laws and usages in force in the province, to authenticate copies of them, as he did; nor was there then or now any authorized imputation that such survey or plot was made at a different time, or received at a different time from that stated by Trudeau, namely, October 8, 1798, or that such plots have not been in his office as public archives ever since. And can it now be presumed, without evidence, that they were not made and deposited in 1798, or that the plots of survey were not made by proper authority? If not made by such authority, would they have been received and kept on record as archives by the proper depository of the surveys as authentic evidence of title? Such presumption is contrary to reason, and not warranted by any principle or rule of law; but on the contrary, the presumption from the facts is irresistible, that it was a plot or survey authorized in such case, constituting an authentic evidence of title in the grantees to the lands therein indicated. Otherwise it would not have been so officially filed and preserved by the lawful and proper depositary of such evidences of title; nor can he be presumed to have acted fraudulently in the matter.

The evidence of genuineness of these plots is, therefore, at least prima facie, established; and there is no testimony contravening this fact. The presumption that the commandant executed the order of the governor, established the boundary of said lands, or caused said plots thereof to be made, is corroborated by these facts; and the stone being mentioned thereon, as a point in the boundary, corroborates the evidence and presumption that said stone was planted by the commandant, or his authority, as a monument or evidence of the boundary of said lands. These copies of said plots, as stated above, were recorded by the board of commissioners June 18, 1808. By acts of congress claimants were required, within a limited time, to produce for record the written evidence of their right, under penalty that if not so recorded they should never be received in evidence in any court; which requirement Winters complied with June 18, 1808, and his grant and these plots were then recorded by the recorder of the United States. But it has been said that the recording gives them no character or validity as evidence; that the recorder should record papers produced without regard to their genuineness or otherwise, and that before a copy of such record can be read, the genuineness of the original must be proven by extraneous evidence.

Can such be a fair exposition of the acts of congress requiring such documentary testimony? If so, the effect would be simply to impose burdens on the claimants, and seduce them into a fatal but delusive security as to the evidences of their titles, by requiring them, under the penalty of losing the benefit of such documents as evidences of their rights if they should fail to have them so recorded, and subjecting them to the expenses incident to such recording. Such we cannot conceive to have been the design of the government, or the effect of the law; and we insist, that by recording them they were intended to be made evidence without further proof, as without such recording they are forbidden to be received as evidence in any court. 1 Land Laws, 519, 528, 548, 620, 636, 640. If such be not the fact, no advantage whatever could result to the claimants, but only advantages to the government, and burdens and prejudice to the claimants; a result not warranted by the spirit of the acts of congress, but directly opposed to it. See Mackay v. Dillon, 4 How. [45 U. S.] 445. Copies admitted by court in Missouri, and admission not disapproved.

But from lapse of time, if from no other principles, the transcripts of these plots ought to be received as evidence, being from the proper office and made by the proper depositary of the original papers, in which office they are in this instance shown to have been since 1798, a period of fifty years, within which time witnesses to the transaction are presumed to have died or departed the vicinity, and especially such may be presumed to be the case in the circumstances of the present case, the act having taken place under a foreign government, and seven years before the present government acquired jurisdiction; the smallness and sparseness of the settlements, and the removal of many of the inhabitants on the change of government, as well as the death of all the parties to the transaction,—the grantees, the commandant, and the surveyor-general. See Duncan v. Beard, 2 Nott & McC. 406; Phil. Ev. 477, 479, and notes; 3 Phil. Ev. 1310; Jackson v. Laroway, 3 Johns. Cas. 283; Hewlett v. Cock, 7 Wend. 371; Barr v. Gratz, 4 Wheat. [17 U. S.] 213; Winn v. Patterson, 9 Pet. [34 U. S.] 674; Patterson v. Winn, 5 Pet. [30 U. S.] 240; 1 Starkie, Ev. 343; [Thomas v. Horlocker], 1 Dall. [1 U. S.] 14; Jackson v. Blanshan, 3 Johns. 292; 10 Johns. 495; 3 Har. & McH. 581; Id. 196; 1 Bay. 364; 2 Nott & McC. 55; 2 Munf. 129; 2 Wash. [Va.] 276; 6 Bin. 435; 2 Day, 280.

It has been asked, also, who are the Mar-

quis De Casa Calvo, and Andres Lopez Armesta? We prove the signature of the latter, and that he was secretary of the province, which may also be seen by the documents published by authority of congress; and by the same it is shown who the Marquis of Casa Calvo was, and his official character. 2 Land Laws, Append. 165, 166. These documents show the change of sovereignty on the 30th November, 1803; they were deposited in the provincial archives, then under the dominion of the United States, December 28, 1803, and certified by Spanish officers, and now published as well authenticated. Spanish proclamation of May 18, 1803, by Salcedo and Casa Calvo, supposes and requests the continuance in office of the existing judicial and ministerial authorities. The dominion, as before stated, was delivered November 30, 1803; October 31, 1803, congress authorized the president to vest in such person or persons as he might elect; the military, civil, and judicial powers, &c.; and on the 26th March, 1804, passed acts for establishing territorial governments, to take effect October 1, 1804, in which provision is made for continuing the existing laws, &c. By what laws and what officers was the country governed in its municipal affairs after the change of dominion, and before the existing laws and officers were reënacted or reappointed by the United States? Surely there can be no doubt as to this; the existing laws and officers remained until superseded by others appointed by the United States. The dominion only was changed, and every thing else remained as before. If this were not so, what was the situation of the province after the cession to France in 1800, and before the cession to the United States in 1803? The sovereignty or right of sovereignty was in France, but the actual government was administered by the existing authorities, and their acts of an administrative character, indeed all their acts, have been recognized by the United States and by France. The official character of Don Vincent Folch is shown by document No. 29. 2 Land Laws, Append. 227. He was governor of Florida from November, 1796, to 1809, and from May, 1809, to October, 1809, and we present his official authentication, as such, of the documents and plots of these lands, showing that they exist in the archives of Louisiana, removed to Florida by Casa Calvo; and his authentication under his seal, as viceroy of Florida, is as authoritative as the great seal of Spain, for as to the province, he stands in place of the king. Lincoln v. Battelle, 6 Wend. 484; Vandervoort v. Smith, 2 Caines, 155; Packard v. Hill, 7 Cow. 434.

In addition to these evidences (which apply to all the cases), the testimony of Gabriel Winter establishes the position of the lands of Wm. Winter, the establishment of the corner of his tract by De Villemont, and his investiture of the land granted him by the commandant. He speaks from personal

knowledge, is a competent witness, and is 'in every particular fully corroborated by other testimony; his interest, if any, is in the question only, which does not disqualify him. 3 Starkie, 781; 1 Starkie, 84, 85. Gabriel Winter never occupied his land, nor was it occupied for him by any tenant of his. But if the proof establishes the grant, and the fact that his land was set apart to him according to the usages of the Spanish government or orders of the governor, and can be identified, it is his. Now if the survey offered be evidence, although the plot is figurative only, it is sufficient; the place of beginning is easily identified, the geography of the country shows where the lake on which it commences is situated, and this the court will judicially notice; and if there is any difficulty about the identity (if the other facts requisite are established), the court should direct a survey, as was done in Florida in sundry cases. By establishing the Winter family on any portion of the lands granted, the condition of the grant as to occupancy was fulfilled, according to the usages then in force; but occupancy was not indispensable, if the lands were set apart for him after being granted to him; they were severed from the domain and became his private property, and we prove that performance of specified conditions was not usual nor required. Customs established control the general laws on subjects to which they relate, and which they embrace. It is proved that there was no surveyor in Arkansas to 1802, which fact must have been known to the governor, and therefore his order required only the establishment of boundaries or beginning points for the surveys; and for the like reason, the custom, as proven, that lands were in that mode assigned to individuals, and they put in possession under and by such designation or establishment of boundary, is not only shown to have existed, but it existed of necessity. Where lands are occupied under a grant, a survey may be presumed. [O'Hara v. U. S.] 15 Pet. [40 U. S.] 283. A copy of a deed required to be enrolled is as good evidence as the original. Dick v. Balch, 8 Pet. [33 U. S.] 33; Jackson v. Cole, 4 Cow. 587; Jackson v. King, 5 Cow. 237; Peck v. Farrington, 9 Wend. 44. Entries of surveys made in his office by registers of land-office in Kentucky or Virginia are evidence of the facts, are public records, and it is not to be presumed that he would place on his records any thing not authorized; and facts proved by such records must be received as prima facie evidence. Galt v. Galloway, 4 Pet. [29 U. S.] 342, 343. So, we insist, the rule is as to matters recorded by the recorder of land titles, who is a sworn officer, and those received and deposited as records or archives by the Spanish surveyor-general, from both of which officers we have authenticated copies of the figurative plots of Winter's survey or grant of lands, as also a sworn copy from the present depositary

and keeper of the latter. Williams v. Sheldon, 10 Wend. 654; People v. Denison, 17 Wend. 312.

A copy of an award recorded in a county, which is afterwards divided, of lands situated in the new county, is properly authenticated by the clerk of the old county. Jackson v. Tibbits, 2 Wend. 592. And so, we insist, is now the rule as to records made in Louisiana, before the division, respecting lands now in Arkansas. Hearsay and general reputation competent testimony as to boundaries. 1 Phil. Ev. 249, 251. The acts and declarations of Winter, from the date of the grant to the date of his settlement at the post, in regard to his removal there, its object, the transportation of the stone and its object, as well as the declaration of Winter, extracted from Stilwell by the examination of the United States, and in answer to interrogatories propounded by them, are competent proofs; the former are res gestæ as to the matter, and the latter being proof elicited by the United States, they can neither impeach the witnesses or object to its competency. What a deceased witness has sworn to at a former trial between the same parties, in relation to the same issue, is proper evidence. Jackson v. Crissey, 3 Wend. 251; Crary v. Sprague, 12 Wend. 41. We insist that the parties and issue were the same when these cases were before the commissioners that they are now; and what witnesses then said, who are now dead, is good evidence, which embraces all the witnesses examined by said commissioners. See, also, Act Cong. 1824, § 4.

S. H. Hempstead, Dist. Atty., argued the case fully in behalf of the United States, on all the points presented; but to defeat the claim relied mainly on the position, that as the concession was indefinite in itself, a survey was necessary to give it locality, and as no survey was ever pretended to have been made, the concession was void. As to the necessity of a survey, which was the turning point in the case, the following is a synopsis of his argument. The survey of lands was always a matter of the first importance in the province of Louisiana. It was generally expressed and always implied, in all grants not capable of complete indentification by natural boundaries. They were made upon conditions that they were not to interfere with previous grants, or in the very phraseology of the grants themselves, "without prejudice to third persons," which most strongly implied the necessity of a survey as the only practicable mode of conforming to this requisition. Actual survey and the actual demarcation of boundaries, by persons properly authorized, were the only means by which authentic official evidence could be furnished of the location of grants, and the separation of private from public property. Without going further back than 1754. the royal regulations and orders, the regulations of the several governors and those of the in-

tendants from that time to the acquisition of Louisiana, affords ample evidence of the truth of the proposition, to say nothing of the uniform usage of the provincial government upon that subject. It is prescribed in the royal regulations, of October 15, 1754. The sixth clause was based on the fact that many grants, sales, and compositions of lands, made after the year 1700, were held by the grantees, without having been surveyed or valued, and directs that confirmations should be withheld until such surveys and valuations should be executed. The seventh clause also speaks of survey and valuation. 2 Land Laws, 52. Count O'Reilly, invested with unlimited civil and military powers, was sent by the king of Spain, in 1769, to the province of Louisiana, for the purpose of establishing there a permanent civil and military government. He states that the king had been pleased by his patent, issued at Arauguez, the 16th April, 1769, to delegate to him powers to establish in the military, the police, the administration of justice, and in the finances, such regulations as should be conducive to the service and the happiness of his majesty's subjects in the colony. On the 18th February, 1770, O'Reilly established general regulations with regard to granting the royal domains. The 12th is as follows: "All grants shall be made in the name of the king by the governor-general of the province, who will at the same time appoint a surveyor to fix the bounds thereof, both in front and depth, in presence of the judge and of two adjoining settlers, who shall be present at the survey; the above-mentioned five persons shall sign the process verbal which shall be made thereof, and the surveyor shall make three copies of the same, one of which shall be deposited in the office of the scrivener of the government and cabildo; another shall be delivered to the governor-general, and the third to the proprietor to be annexed to the titles of his grant." 2 Land Laws, Append. 206.

The regulations of O'Reilly were not only expressly sanctioned by the king, on the 24th August, of the same year, but Don Louis De Unzaga, then the governor-general of Louisiana and his successors, were specially required to conform to them in all points, until they should be changed by his majesty. 2 Land Laws, Append. 530. From the 18th February, 1770, this regulation requiring a formal and particular survey of concessions, was the law of the whole province of Louisiana, and from the 24th August following, possessed the force of a royal cedula, which no representative or tribunal of the Spanish monarch was at liberty to modify or disregard. It does not appear that it was ever abrogated, or changed by the king, and indeed the uniform practice of the provincial government conforming to it, is the highest evidence of its having become firmly ingrafted upon the civil system of government

which existed in the province of Louisiana. But this is not the only evidence. Governor Gayoso, in his instructions, of the 9th September, 1797, declares that the forms established by his predecessors, in which to petition for lands, should be followed, and it is apparent that they carry out the general policy contained in those of O'Reilly. In a letter of Gayoso to Morales, the intendant-general, dated March 5, 1799, he says: "I also send you the form of the first decree which it has been the custom to issue before the survey was made. Of the registers which will soon be sent you, you will see the form in these used by all my predecessors." The intendant-general of the province of Louisiana, Morales, in a letter to Don Pedro Varela Ulloa, the king's minister, dated October 16, 1797, respecting grants of land, says: "In order to obtain lands from the exchequer (fisco) the custom is still pursued which prevailed when the French were masters of the country, except in so far as the government and the intendancy acted in concert; and no other form is or has been observed than the presentation of a memorial by the petitioner praying for a certain number of arpens and designating their location. In virtue of this the surveyor or commandant of the post, with the assistance of the neighbors, makes the survey, and if no objection be offered puts the party in possession and gives him the papers necessary for having his title drawn out; this title is issued upon the strength of these papers, a minute of it being preserved in the office, in order that it may be noted in the book of grants; the sum which is to be paid to the surveyor or commandant for his trouble, is then delivered or put aside; and the duty of five per cent. for office fees being retained, the petitioner remains in full and quiet possession of the quantity of land which it may please the governor to grant. What I have said in the last paragraph must be understood as regarding inhabitants or planters who solicit grants of land; with respect to new settlers, although the commandant of the district in which they wish to fix themselves, may have surveyed and assigned to them the quantity of land which they and their families are considered capable of cultivating, there are yet but few who have obtained the titles which should have been furnished to them." 2 Land Laws, Append. 542.

The power of granting lands was exclusively vested in the intendancy, in 1798, it having been previously exercised by the governor-general; this appears from the royal order of October 22d, 1798. 2 Land Laws, Append. 208, 542–545, et seq. Morales, intendant-general of Louisiana, published his general regulations, July 17, 1779, consisting of thirty-eight articles relative to granting lands. The 15th article is in almost the same language as the 12th clause of the regulations of Count O'Reilly; it is as follows:—

"Article 15th. All concessions shall be given in the name of the king, by the general intendant of the province, who shall order the surveyor-general, or one particularly named by him, to make the survey and mark the land by fixing the bounds not only in front but also in the rear; this survey ought to done in the presence of the commandant or syndic of the district, and of two of the neighbors, and these five shall sign the process verbal which shall be drawn up by the surveyor." The 16th article requires the process verbal with a certified copy to be sent by the surveyor to the intendant; to the end that on the original process verbal, the necessary title paper, with the certified copy attached, be issued and delivered to the grantee. The original was required to be deposited in the office of the secretary and recorded, "to the end that at all times and against all accidents the documents which shall be wanted can be found." The 17th article requires the titles of concessions to be recorded in books to be kept for that purpose. The 18th article is as follows:—"Experience proves that a great number of those who have asked for land think themselves the owners of it; those who have obtained the first decree by which the surveyor is ordered to measure it and put them in possession; others, after the survey has been made, have neglected to ask for the title to the property; we declare that any one of these who have obtained the said decrees, notwithstanding in virtue of them the survey has taken place, and that they have been put in possession, cannot be regarded as owners of land until their real titles are delivered completed with all the formalities before cited." The 25th and 38th articles show that the grantees were obliged to pay the surveyor for his services, and to have the surveys executed at their own expense; and the more particularly was this the case in gratuitous concessions. "The fees of the surveyor in every case comprehended in the present regulation, shall be proportionate to the labor and that which has been customary until this time to pay," is the language of the 30th article. 2 Land Laws, Append. 208, et seq.

It is true that these regulations were promulgated after this particular concession was made; but it is obvious that they merely embodied general priciples contained in antecedent royal orders, and regulations of previous governor-generals, and enunciated with greater particularity, rules, regulations, and usages then existing in the province of Louisiana, and which had existed long anterior to the year 1797. This is not left to doubtful inference, for the intendant Morales expressly informs us that he prepared his regulations "after having examined with the greatest attention the regulation made by the Count O'Reilly, of the 18th February, 1770, as well as that circulated by Governor Gayoso, of January 1st, 1798, and after he

had taken counsel of the assessor of the intendancy and of other persons skilled in those matters." The regulations of Morales, then, did not profess to establish any new system, but merely to give publicity to an old one, and point out with more precision those things which were esteemed essential to obtain a complete right of property in granted lands. No substantial alterations were made, and indeed their similitude to those of the Count O'Reilly in their main parts cannot escape observation, and, in a word, a close scrutiny will'prove that. It was no idle assertion of the intendant that he had examined the regulations of the Count O'Reilly with the greatest attention. 2 Land Laws, Append. 209.

It cannot admit of doubt, that even long before O'Reilly was sent to Louisiana, there were surveyors in each of the districts of the province, who.were salaried officers, and 'whose duty it was to survey grants of land when called on by grantees for that purpose, and to make an official report of such surveys to the governor-general or granting power, which then became an official record. It appears from the letter of the king's minister, the Marquis De Grimaldi, that O'Reilly had appointed surveyors for districts in the province at half their former salary, which appointment the king approved. 2 Land Laws, Append. 530. Indeed, it is a matter of public history, that surveyors were always "part and parcel" of the government of the province of Louisiana. If we look to the official records of the Spanish government in Florida, we shall find, that at least as early as 1791, instructions, emanating from the provincial government, were given to surveyors, as to the manner of measuring and establishing the boundary lines of granted lands. 1 Land Laws, Append. 1004. In that year, Quesadee, governor of Florida, appointed Pedro Marrot to the office of surveyor-g'neral, and prescribed several standing rules for the direction of that officer. The 9th rule is: "When lands are to be sui veyed bounding those of individuals having them of their own, they will be cited to appear for the purpose of exhibiting their titles permitting them to remain in possession, running the lines without injuring them; and the government reserving the right of examining at a proper time the validity of their titles, and the defects of their petitions." Again, in the 1st rule he is directed to "take care that the measurements be made adhering to the title."

These instructions or rules were dated and issued October 24, 1791. 1 Land Laws, Append. 997, 998. On the 29th October, 1790, it had been communicated to governor Quesada as the order of the king of Spain, that foreigners who would freely present themselves and swear allegiance to his majesty, should have lands granted and measured to them, in proportion to the working hands each family might have. 1 Land Laws, Append. 996. The 9th clause of the regulations of Governor White, of October 12th, 1803, declares that all persons who abandoned or ceased to cultivate lands, which at any period shall have been measured to them by the surveyor-general, although they had obtained the corresponding title of property, should nevertheless lose and forfeit their right thereto. 1 Land Laws, Append. 101. Governor Estrada, who succeeded Governor White, commissioned George J. F. Clarke as surveyor-general of the Province of Florida, on the 2d of May, 1811. The commission recites, that whereas, the appointment of public surveyor being vacant on account of the absence of Don John Porcel, who exercised the same, and therefore being in the want.of one for the measurement by the government in the laying off of lands, &c. 1 Land Laws, Append. 1003. Certain .nstructions were promulgated by Estrada, on the 11th June, 1811, for the government of the surveyor-general in the discharge of his official duties; some of them will be referred to. "2d. The surveyor having been called on by any person to measure and bound lands to him, he will require his title of property or grant from government, that on sight thereof he may proceed to its measurement and demarcation." "5th. To each person whose lands have been measured, a plot will be given, constructed in running lines of ink, marking in the perimeter the corners by a small circle of a line in diameter, and on the longitude of each line note its magnetic direction and length in chains and links. . . . In the centre of plot he will place in numbers the acres of land which he has measured. The plot being made, he will deliver it with the following description: 'Plot of the number of acres of land of A. B., in such a place, measured and bounded by the public surveyor of this province. Don George Clarke, East Florida, the day of the year and month on the same tract. George Clarke.' 6th. The surveyor will keep a book of large paper, and copy therein the plots he gives out according to the foregoing article. . . . 7th. The book mentioned in the foregoing article will serve to show government what lands are vacant or not measured; he should form in legal surveys a journal of his operations, to satisfy the persons having lands adjoining. 8th. That the boundaries shall be permanent, he will cause to be drove down at the corners stakes of three feet long and three inches thick at their heads, leaving them three inches above ground. 9th. Those who employ the surveyor will pay him four dollars per day for his personal services, calculating from his departure from the mansion where he is found until he concludes the work performed for them." 1 Land Laws, Append. 1004.

The commissioners for ascertaining Spanish claims in West Florida, namely, Samuel R. Overton, Joseph M. White, and Craven P.

Luckett, in their report, in 1824, state that "the first step in obtaining a gratuitous concession, was the presentment of a petition to the sub-delegate, or authority vested with the power of disposing of lands. This petition was referred to the surveyor, who was required to report whether the tract solicited was vacant and royal domain." "The subject was next submitted to the fiscal or king's attorney, whose province it was to state whether or not there were any objections to a compliance with the petition. When these reports were found to be favorable, the sub-delegate made the concession, fixed the terms, and passed the decretal order of survey. After all which had been fulfilled and executed, it was forwarded to the office of intendency for confirmation. Where any doubts existed as to the land being vacant and royal domain, the order of survey preceded the concession." 1 Land Laws, Append. 1043.

Such a mass of evidence, running through a period of more than fifty years, and harmonizing in all its parts, must certainly be regarded as establishing the necessity of surveys. No exceptions are provided for, and if there were any, it is the duty of the claimant to prove them by the strongest testimony, inasmuch since the law and the uniform usage under it are against him. It is evident that a warrant or order of survey could be executed by the surveyor-general or any of his deputies, or the surveyor of any district, or by the commandant of a post, or by a private person specially authorized by the governor-general or intendant. It appears to have been at one period a common practice in Florida for private persons to execute warrants or orders of survey by the direction of the governor, and upon which surveys formal and perfect titles were issued. 1 Land Laws, Append. 1014, et seq.; U. S. v. Harrison, 16 Pet. [41 U. S.] 198, et seq. In Smith v. U. S., 10 Pet. [35 U. S.] 334, it is said that "Spain never permitted individuals to locate their grants by mere private survey. The grants were an authority to the public surveyor or his deputy to make the survey as a public trust to protect the royal domain from being cut up at the pleasure of the grantees. A grant might be directed to a private person, or a separate official order given to make the survey; but without either, it would not be a legal execution of the power." Again: "But neither in this, nor the record of any of the cases which have been before us, have we seen any evidence of any law of Spain, local regulation, law, or usage, which makes a private survey operate to sever any land from the royal domain; on the contrary, all the surveys which have been exhibited in the cases decided were made by the surveyor-general of the province, his deputies, the special order of the governor or intendant, or those who represented them. No government gives any validity to private surveys of its warrants or orders of survey; and we have no reason to think that Spain was a solitary exception, even as to the general domain, by grants in the ordinary mode for a specific quantity to be located in one place."

Between a survey by the public surveyor and an authorized survey by a private person, there was a wide difference. A survey made by a public surveyor, in the discharge of his public duties, is admitted in evidence in suits between other parties, because the act is done under oath, and in the discharge of his duties to the government and the public. These duties are to measure the land by compass and chain, to establish corners, mark lines, and to preserve accurate field notes of the survey, with such explanations as may be required to give it certainty. A plot is then made, which embodies, in a condensed form, the whole survey, and shows the lines, corners, trees, rivers, creeks, and other natural and artificial objects on the ground, with such remarks as may explain them. The statement, however, of collateral facts not within the scope of his proper official functions, are not admissible as evidence. Ellicott v. Pearl, 10 Pet. [35 U. S.] 441; U. S. v. Hanson, 16 Pet. [41 U. S.] 198. It is upon this principle that it has been frequently held in the Florida cases, that because of the official character of the surveyor-general, the plots and certificates made by him, in the discharge of his official duty, have accorded to them the force and character of a deposition; but as to a survey by a private person, nothing is presumed, and every thing must be proved. U. S. v. Hanson, Id. 200, 201; [Smith v. U. S.] 10 Pet. [35 U. S.] 334; [U. S. v. Low] 16 Pet. [41 U. S.] 162.

The Spanish regulations attended to most clearly evince that when a concession was made, the duty was imposed on the grantee of having the order of survey executed, and the survey returned to the proper officer at his own expense, and without any cost to the royal treasury. In other words, the concession being an authority to the surveyor-general and his deputies to make the survey as a public trust, it was the duty of the grantee to call upon him for that purpose, or to procure authority for a private person to do it. The government contented itself, in the first instance, with giving the authority to survey, and then leaving it to the party to procure the execution of that authority. If he failed, he could not claim any right of private property in the grant, nor could he obtain any title without complying with this necessary condition. There was no law, order, cedula regulation, usage, or custom of the province of Louisiana or Florida which authorized this condition to be dispensed within any case, or under any circumstances. It is also evident that a survey meant in these provinces what it means with us, the actual measurement of land, ascertaining the contents by running lines and

angles, marking the same, and fixing corners and boundaries. 6 Jac. Law Dict. 157; Webst. Dict. When the phrase is applied to land, no other meaning is attached to it by lexicographers; nor is it used in a different sense in the jurisprudence of any country with which I am acquainted. This is no idle inquiry, because these kind of cases are not to be tried by common law rules, but by the laws, customs, and usages of the province of Louisiana; and hence the judges of the supreme court, in all the cases brought before them, have referred to these as guides. In doing this it would have been impossible to overlook the fact that actual surveys were a necessary ingredient to the validity of grants under the Spanish dominion, and it has consequently been directly or indirectly arrested in numerous cases decided by that tribunal to be equally necessary under the government. Wherry v. U. S., 15 Pet. [40 U. S.] 327; U. S. v. Forbes, Id. 180; Buyck v. U. S., Id. 220; O'Hara v. U. S., Id. 297; U. S. v. Delespine, Id. 328; U. S. v. Miranda, 16 Pet. [41 U. S.] 155; U. S. v. Low, Id. 162; U. S. v. Harrison, Id. 198; U. S. v. Clarke, Id. 228; U. S. v. King, 3 How. [44 U. S.] 784.

The Spanish document adduced as the foundation of this claim is an open order of survey, and might have been located in any part of the then district of Arkansas. It had no locality, no definite description of any particular land. There are two substantial conditions in it: 1st, that the lands conceded should be surveyed in one year, which the commandant of the post should cause to be executed; and, 2d, that the grantees should settle upon and occupy their respective surveys within that period. These two conditions are fairly deducible from this paper, which, for the sake of convenience, will be called a grant; and it may be observed that it was undoubtedly competent for the governor-general to order the commandant to cause the survey to be executed. Smith v. U. S., 10 Pet. [35 U. S.] 327. It is not pretended that the lands mentioned in the grant were ever surveyed under the Spanish government; indeed that they were not, is shown in the petition itself. But it is said that as to the lands granted to Elisha and Wm. Winter, a stone or stones were planted, and that this gave locality and identity to the tracts, and severed them from the royal domain. The bare statement of the proposition is its refutation. Fixing a stone or post is no survey, nor is it equivalent to a survey. It does not of itself indicate whether it is the corner of a north, east, south, or west line; nor does it indicate that the lines are to run from it to the cardinal points of the compass. But to go further: planting a stone to designate any particular corner, with a contemporaneous assertion that a parallel line is to be run a certain distance and direction, and thence in other directions, so as to form a square. is no identification of the land by any mode known to the Spanish

government; nor is it so in fact. There are no visible lines, no visible boundaries, nothing to apprise our neighbor how far he may go without trespassing upon our soil, and nothing to indicate the lines of separation between public and private property. The idea of giving identity to a million and a half of arpens of land without measurement, and without actually running and marking a single line, is really too absurd to merit consideration. If it were not gravely insisted on, it might well be thought to be an experiment on human credulity.

Now supposing, for the sake of argument, that all the testimony taken or adduced in this cause, as to planting a corner-stone, is competent, and that none of it ought to be excluded, what does it amount to? Certainly to nothing more than that in 1798 Elisha Winter, the father, planted a large stone, intending thereby to designate the tract granted to him; and that this was done in the presence of the commandant of the post of Arkansas, Don Carlos De Villemont. It is a singular and important fact, that the statement of this person, made more than thirty years ago, when the matter must have been fresh in his recollection, is entirely silent as to what course the stone was to designate, or to what points of the compass the lines were to run from it. This omission could not have proceeded from defect in memory, and it can only be accounted for on the supposition that the act of planting the stone was esteemed to be of so little consequence, that nothing was said on the subject. As if to admonish us of the intrinsic infirmity of hearsay evidence, and the propriety of excluding it, it is stated by persons examined since the pending of this suit that they understood, principally however from the family of Winter. that this stone was actually intended to designate the south-east corner of this tract, and that the lines were to run to the cardinal points of the compass; a statement condemned by the silence of Don Carlos De Villemont, the very person who would have known it if such had been the fact. Could the stone, in the very nature of things, designate or identify any land? Could it not be the corner of four separate tracts? Could not lines from it be run north as well as south. and east as well as west. or north-east. north-west, south-west, or south-east? It was, therefore, an idle and nugatory act, and could not, in the very nature of things, separate any land from the royal domain.

It cannot be doubted that a survey was contemplated and required by the grant itself, a requisition indeed enforced by a general law sanctioned by the monarch himself. The petitioners, satisfied as they must be that nothing was done equivalent to a survey, or to identify the land. are driven to the flimsy excuse that there was no public surveyor within the district of Arkan-

sas, and thus indirectly admitting a survey to be essential. The commandant alluded to says:—"There was no public surveyor in the district of Arkansas at that time (1798), nor afterwards, during my command, down to the year 1802; on which account these tracts were not surveyed nor platted in the ordinary manner." This is insufficient to excuse the non-performance of the conditions, because the fact must have been as well known in 1797 as it was the year after. U. S. v. Kingsley, 12 Pet [37 U. S.] 484. The condition ·was not impossible, but on the contrary was reasonable and proper, and one of two things must· be established by the claimants, either that it was complied with, or that the performance of it was excused by the governor-general, and also that he was competent to excuse its performance, because, as plenary as his authority might have been, he was a subordinate officer, bound to execute the will of the king, whether expressed in royal orders, regulations, or in other modes which might have been adopted. The Baron Carondelet had no dispensing power; he could not say that a survey need not be made, or that a right of private property should vest without identity to the land. But it is fruitless to inquire what he might or might not have done, ьince it is not pretended that the performance of the conditions was ever excused. To say that there was no public surveyor in the district of Arkansas in 1798, amounts to nothing. There was a surveyor-general at New Orleans, who could constitute deputies and send them to any part of the province to execute surveys at the request of a grantee, and upon the payment of the usual compensation. If Elisha Winter did not choose to invoke his aid, the governor-general could have authorized a private person to make and return the survey, which it is reasonable to infer would have been done upon application, especially as we are informed that Winter was on· terms of intimacy with that functionary, and was, according to the proof, in New Orleans a greater portion of the time between 1797 and 1800. The commandant of Arkansas post could doubtless have authorized a competent person to make and return the survey, by virtue of the direction in the grant to cause the surveys to be executed. The means to enable Winter to comply with this part of the grant were ample, sufficiently convenient, and at his command. Surely judicial tribunals will not undertake to relieve him from the consequences of his own neglect. The time allowed, one year, was abundant; and certainly it was not too much to expect, that as he had obtained from the bounty of the government a grant of enormous size, larger than many of the German principalities, he would not only willingly bear the inconvenience and expense of its separation from the royal domain, but would hasten the consummation of that event with all the forms and solemnities known to the law.

Under the Spanish government, the mode of designating grants, and investing individuals with the right of property therein, was attended with solemnity and publicity. The practice in such cases was in many respects analogous to livery of seizin, as used under the feudal system at an early period of English jurisprudence. A grant delivered out for survey meant, not as in our country, a perfect title, but an incipient right, which, when surveyed, required confirmation by the governor. [U. S. v. Hanson] 16 Pet. [41 U. S.] 200. And hence in this concession a survey is enjoined, to the end that each grantee may receive a title in due form. In the province of Louisiana, not only were actual boundary lines to be marked and established, and corners planted by an authorized surveyor, but the party was then formally put into possession, either by the surveyor or commandant, in the presence of his neighbors, provided there was no objection, and it did not interfere with the rights of third persons. The grant required a survey of the land, not planting a stone, which without survey could be nothing but an idle ceremony. But it is insisted that no lands were surveyed at the post of Arkansas, and that it was a custom there for the commandant to put persons in possession without it. To that I reply that the assertion is not proved, but if it was, such a custom,—if a thing rarely practised and confined to a few interested persons can be so called,— was in positive violation of the law existing in the province on that subject. No usage or custom can ever prevail against an act of parliament,—a principle which must utterly destroy the usage of the post of Arkansas.

But it is said that it was the policy of the Baron De Carondelet to encourage settlements, and to dispense with surveys, if necessary to attain that end; and we are entertained with a sort of review of the acts of himself as governor-general. But will it advance us a single· step in the cause to inquire into the policy of the baron during the five years he was governor-general, or to contrast his administration with that of Estevan Miro, his predecessor, or Gayoso, his successor? It would be quite as· pertinent to investigate the Spanish intrigue set on foot as early as 1790 to separate the territory west of the Alleghany mountains from the Union, and its total failure; or to· show that the Baron De Carondelet commenced his administration in 1792 with a scheme to sever Kentucky from the confederacy and bring her under Spanish dominion, and failed in it; or that he set it on foot a second time in 1795, sent an emissary· into Kentucky in the person of Gayoso. then lieutenant-governor· of Natchez, and again failed; or that the baron made a third attempt in 1796, and again signally failed. It would be a waste of time to· wade through the rubbish of Spanish rule, to find out the policy of Spanish officials. We· should discover enough at every step to demonstrate hostility to American citizens and American interests; corruption in office, and.

breaches of public and private faith. Whether the policy of the Baron De Carondelet was good or bad, is of no importance to the present question. He had not the right, and did not, in point of fact, dispense with a survey.

But it is said that figurative plots of the Winter grants were found in the offices in New Orleans. And of what avail is it to produce figurative plots or plans—mere creatures of the brain—office sketches, that can be made at any time? These sketches only present the supposed outlines of a tract of land, which could be made at a distance from the land, and without ever seeing it, by one having a general knowledge of the face of the country. They show no bearings and distances, no field marks or boundaries, no latitude or longitude, and no natural or artificial objects on the ground. Constructive journeys, constructive corners, constructive lines, make up these constructive surveys. They are destitute of reality, and carry deception on their face. Two conditions arise from a fair construction of the concession: First, that each grantee would cause his grant to be surveyed; second, that he would establish himself on it within one year; and it was upon the performance of these conditions that each grantee could receive his "title deed in form." Non-performance within the time limited amounted to a forfeiture, or, to use the express language of the concession, the grant "became void." To speak with legal exactness, the lands granted could not vest in the grantees until a compliance with those conditions. No specific lands were appropriated in the document itself, and as none were severed from the royal domain, by authentic survey, it was impossible for the grantees to occupy the lands granted. Occupancy is equivalent to seizin or possession, and it is certainly too clear to be controverted, that identity of the premises is essential to a seizin in law, as it is necessarily implied in a seizin in fact. U. S. v. Miranda, 16 Pet. [41 U. S.] 159; Arredondo's Case, 6 Pet. [31 U. S.] 741.

JOHNSON, District Judge. This is a petition filed by the heirs of Elisha Winter, under the act of congress of the 26th May, 1824, entitled "An act enabling the claimants of lands within the limits of the state of Missouri and territory of Arkansas to institute proceeding to try the validity of their claims," revived for five years by the act of 17th July, 1844; and the claim mentioned in the petition is for one million of arpens of land, in the state of Arkansas, based upon a Spanish concession, made by the Baron De Carondelet, governor-general of the province of Louisiana, the 27th day of June, 1797, to Elisha Winter, the ancestor of the petitioners. 4 Stat. 52; 5 Stat. 676. The answer of the district attorney denies all the statements and allegations in the petition, and full proof is demanded thereof. From the commencement of the case, every reasonable indulgence has been extended to the claimants, to enable them to procure all

the proof within their reach, and doubtless we now have all that could be found, material to their rights.

The case has been thoroughly investigated by the counsel on both sides, and it gives me pleasure to add, that it has been argued by them with great zeal and uncommon ability, and which will the better enable me to form a correct opinion upon the questions which it is now my duty to decide. Most of the testimony offered by the claimants has been excepted to by the district attorney; and these exceptions are on file in the case, as a part of the record. Some of them were decided by the court before the hearing; but finding that course of proceeding calculated to produce inconvenience and delay, and in a collateral manner bring about a decision upon the merits of the cause, the rule requiring exceptions to be filed was rescinded. But I will add, that as far as decisions have been made on exceptions, they are entirely satisfactory to my mind, and will be adhered to, and the principles therein contained, applied upon the present occasion.

As to the exceptions filed by the district attorney, not yet expressly decided, I will merely remark, that it is not deemed necessary to the rights of either party that this court should decide specifically upon each exception, because it would be useless as far as it could have any effect here; and in case of appeal to the supreme court, all the testimony and the exceptions to it will appear of record, and thus each party there will derive the same advantage and benefit, as if there was a specific decision upon each exception; for the inquiry then will be, not how this court has decided, but whether the decision is sustained by the principles of law, and warranted by legal and competent evidence. Without taking upon myself, therefore, the unnecessary labor of deciding collateral questions, I will now proceed to the main and prominent points in the case.

The paper in the Spanish language, which is produced as the foundation of this claim, is really nothing more than an order or warrant of survey, and strictly speaking is not a concession; but for the sake of convenience I shall call it the latter. Several translations of it have been brought to the notice of the court, but I shall not undertake to determine how nearly these translations assimilate to each other, because, should this case be taken to the supreme court, that tribunal will have no difficulty in ascertaining the true meaning of the paper. Without descending to particulars on this point, I will only observe that I regard this concession as authorizing Elisha Winter to select, within the then district of Arkansas, one million of arpens of land, which was to be severed from the royal domain, and occupied within one year from the date of the concession, or else the concession to be void; in other words, that he was to establish himself upon it in one year. The genuineness of the signature of the Baron De Carondelet to the

concession, has been, in my opinion, sufficiently proved by competent witnesses,—those who are acquainted with his handwriting,—so as to entitle it to be used as evidence in any court of justice.

The district attorney in his argument, insists that the Baron De Carondelet had no authority to make so extensive a grant, and that if he could rightfully do so, he might with the same propriety have conceded to any private individual, as a mere gratuity, a whole parish or district of the royal domain. Certainly no one can doubt that a concession so immense ought to be closely scrutinized; but at the same time I do not feel it incumbent upon me to inquire into the precise extent and nature of the powers vested in the governor-generals of Louisiana as it respects the quantity of land which could be granted. The supreme court of the United States has frequently decided in this kind of cases, that a grant or concession made by an officer who has by law authority to make it, carries with it primâ facie evidence that it is within his power, unless the contrary is shown; and it is, therefore, no longer a debatable question. U. S. v. Arredondo, 6 Pet. [31 U. S.] 691; [U. S. v. Percheman] 7 Pet. [32 U. S.] 51; [U. S. v. Clarke] 8 Pet. [33 U. S.] 436; [Delassus v. U. S.] 9 Pet. [34 U. S.] 134.

Without further inquiry, therefore, I shall assume that the Baron De Carondelet possessed the power to make this concession; that the extraordinary extent of it is no objection to its validity and then comes the main question in the case, namely, whether the land mentioned in the concession, was separated from the royal domain, so as to vest a right of property in the grantee, and thus bring it within the purview of the treaty of Paris of the 30th April, 1803. It is almost superfluous to add, that the whole case must turn upon this solitary point, for however meritorious the claim may be, and however strong the considerations which may favorably recommend it to the political departments of the government, it is not competent for the judiciary, either to grant land, give an equivalent, or confirm a claim that is destitute of identity. Indeed, the act of the 26th May, 1824, confers the special and limited authority under which this court must act in these cases; and by reference to that law it will be seen that the locality of a claim must be ascertained to give the court jurisdiction. 4 Stat. 52. Now this concession on the face of it is utterly indefinite, and does not appropriate any specific lands to the grantees; and hence it is material to inquire whether an actual survey of such a concession as this was necessary to vest a right to the property in the grantee? The district attorney maintains the affirmative; and in my opinion he has successfully sustained that position, by referring to royal orders; to regulations of different governor-generals of the province of Louisiana, running through a period of nearly fifty years; to regulations in Florida, on the same subject; and lastly, to various adjudications of the supreme court of the United States.

It is perfectly obvious, that among civilized nations, where individual ownership of the soil is recognized as a right, some mode of designating every man's land must necessarily be adopted. Indeed, without any regulations at all upon that subject in Louisiana and Florida, the survey of lands would have followed as a natural consequence upon making grants; for without surveys, the confusion in land titles, and the disputes and litigation that must have ensued, would have been intolerable evils which no government would allow. In point of fact the survey of grants of land was common in the province of Louisiana as early as 1754, because the sixth and seventh clauses of the royal order of that year, of date the 15th October, expressly require surveys to be made. 2 Land Laws, 52.

The most solemn and imposing regulations, however, upon the subject of surveying lands, are found in the twelfth clause of the general regulations of Count O'Reilly, civil and military governor of the province of Louisiana, promulgated on the 18th of February, 1770. That clause is as follows: "(12) All grants shall be made in the name of the king, by the governor-general of the province, who will at the same time appoint a surveyor to fix the bounds thereof, both in front and depth, in presence of the judge ordinary of the district, and of the adjoining settlers who shall be present at the survey; the above-named four persons shall sign the process verbal which shall be made thereof, and the surveyor shall make three copies of the same: one of which shall be deposited in the office of the scrivener of the government and cabeldo, another shall be delivered to the governor-general, and the third to the proprietor to be annexed to the title of his grant." 2 Land Laws, Append. 206.

The regulations of O'Reilly probably stand upon higher ground than those of any of his successors, because they were expressly sanctioned by the king himself, on the 24th August, 1770, the same year they were promulgated; and the governor-generals of Louisiana were specially required by the monarch to conform thereto, until it was his royal pleasure to change them. 2 Land Laws, Append. 530. There is no evidence that they were changed or modified at any subsequent period as far as surveys of grants were concerned. On the contrary, the instructions of Gayoso, dated the 9th September, 1797, and the regulations of Morales, intendant general of Louisiana, published 17th July, 1799, very clearly indicate that surveys were essential. In fact the fifteenth article of the regulations of Morales, is almost literally copied from the

twelfth clause of O'Reilly's regulations already referred to. The general practice of the government conformed to these regulations; and it is known that there was a surveyor-general in upper, and another in lower Louisiana, each of whom had authority to constitute as many deputies as they pleased, with a view to execute surveys. Undoubtedly the Spanish regulations show, that when a concession was made, the duty was imposed on the grantee of having the order of survey executed at his own expense; and a return of the survey was to be made to the proper officer; and all this without cost to the royal treasury. In other words the concession was an authority to the surveyor-general and his deputies, to make the survey as a public trust; and it was the duty of the grantee to call upon him for that purpose, or procure authority for a private person to do it.

The government contented itself in the first instance with giving the authority to survey, and then leaving it to the party interested to procure the execution of that authority. No law or regulation existing in the province of Louisiana, has been brought to the notice of the court, which dispensed with a survey in the case of an open floating concession, and it is presumed there was none. It is also quite evident that a survey under the Spanish government meant, as with us, the actual measurement of land, ascertaining the contents by running lines and angles, marking the same, and fixing corners and boundaries. 1 Land Laws, Append. 996–998, 1001, 1003, 1004, 1014, 1043; U. S. v. Hanson, 16 Pet. [41 U. S.] 198; 6 Jac. Law Dict. 157. "The survey," say the supreme court, in Ellicott v. Pearl, 10 Pet. [35 U. S.] 441, "made by a surveyor being under oath, is evidence as to all things which are properly within the line of his duty. But his duty is confined to describing and marking on the plot the lines, corners, trees, and other objects on the ground; and to subjoin such remarks as may explain them; but in all other respects, and as to all other facts he stands like any other witness, to be examined on oath, in the presence of the parties, and subject to cross-examination." This case is cited, because in pointing out the duty of a surveyor of land, it clearly shows the nature of a survey, and what must be understood by it; namely, running lines with compass and chain, establishing corners, marking trees and other objects on the ground, giving bearings and distances, and making descriptive field notes and plots of the works. These are the ingredients of an actual survey, as well as the evidences of it; for it is not the mere assertion of the surveyor that he had surveyed land that makes it so. U. S. v. Hanson, 16 Pet. [41 U. S.] 200.

A return by the surveyor-general, embracing a description of a survey of land in legal form, was prima facie competent evidence without further proof on which the granting power could act. Plots and certificates, on account of the official character of the surveyor-general, had accorded to them the force and character of a deposition. [U. S. v. Hanson] 16 Pet. [41 U. S.] 200, 201; [U. S. v. Wiggins] 14 Pet. [39 U. S.] 346.

It is evident also, that a warrant or order of survey could be executed by the surveyor-general, or any deputy appointed by him; or the surveyor of the district, or by the commandant of a post, or by a private person specially authorized by the governor-general or intendant. It appears to have been at one period a common practice in Florida, for private persons to execute warrants or orders of survey by the direction of the governor, and upon these surveys formal and perfect titles were issued to the interested parties. 1 Land Laws, Append. 1014 et seq.; [U. S. v. Hanson] 16 Pet. [41 U. S.] 198. In Smith v. U. S., 10 Pet. [35 U. S.] 334, it is said that "Spain never permitted individuals to locate their grants by mere private survey. The grants were an authority to the public surveyor, or his deputy, to make the survey as a public trust, to protect the royal domain from being cut up at the pleasure of grantees. A grant might be directed to a private person, or a separate official order given to make the survey; but without either, it could not be a legal execution of the power." And in the same case it is further said, that, "neither in this nor the record of any of the cases which have been before us, have we seen any evidence of any law of Spain, local regulation, or usage, which makes a private survey operate to sever any land from the royal domain. On the contrary, all surveys which have been exhibited in the cases decided were made by the surveyor-general of the province, or his deputies, or under the special order of the governor or intendant, or those who represent them. No government gives any validity to private surveys of its warrants or orders of surveys, and we have no reason to think that Spain was a solitary exception even as to the general domain, by grants in the ordinary mode, for a specific quantity to be located in one place."

The supreme court of the United States, in various cases, has either directly or indirectly decided, that an actual survey of an open floating concession is a necessary ingredient to its validity; and that it must also be an authorized survey to sever any land from the royal domain. I shall make no comment on these cases, but merely refer to them. Wherry v. U. S., 10 Pet. [35 U. S.] 338; Smith v. U. S., Id. 327; U. S. v. Forbes, 15 Pet. [40 U. S.] 180; Buyck v. U. S., Id. 230; O'Hara v. U. S., Id. 297; U. S. v. Delespine, Id. 328; U. S. v. Miranda, 16 Pet. [41 U. S.] 155, 162; U. S. v. Hanson, Id. 198; U. S. v. Clarke, Id. 228; U. S. v. King, 3 How.

[44 U. S.] 784; U. S. v. Lawton, 5 How. [46 U. S.] 26. But upon this point I need not multiply authorities. Ordinances and regulations expressly sanctioned by the king, practice conforming to these regulations, the decisions of our courts of justice, all combine to establish it as a proposition beyond dispute, that a concession indefinite in itself, is void, without the aid of an official survey. In most grants, even those of a descriptive character, which designated the place where the lands were to be located, a survey was required to be made and returned before a party could obtain a formal and perfect title. Non-interference with the rights of others was a condition which attached to all grants, and was generally expressed; but if not expressed, always implied. This, of itself, demanded an actual survey on the ground, as the only certain mode of observing that condition. The actual demarcation of boundary lines by authorized persons, and the formal return of the proceeding were the only means of affording authentic official evidence of the location of grants and the separation of public from private property.

It is not pretended that the lands mentioned in this concession were surveyed within one year, nor before the 10th day of March, 1804. On the contrary, the fact is distinctly alleged in the petition, that there was no actual survey; and an excuse is offered for the omission, which, when scrutinized, will be found to be insufficient. According to a well-established rule, this averment cannot be controverted by proof on the part of the petitioners; they being bound to abide by their own pleadings. To obviate the want of a survey, it is said that a corner-stone was planted, under the direction of Don Carlos De Villemont, to designate the grant made to Elisha Winter, and that it was a proceeding of great solemnity. There is, in my judgment, no competent evidence adduced to show the planting of this stone by the authority, or under the direction and superintendence of Don Carlos De Villemont, as commandant of the post of Arkansas. But if there was, it has been shown to be a clear departure from the Spanish regulations respecting the location of grants; and hence a nugatory and idle act. Fixing a stone post or monument at any particular spot is no survey, nor equivalent to it; nor is it the slightest indication whether it is a northern, eastern, southern, or western corner; nor does it indicate how the boundary lines are to run. But to go further still,—planting or erecting a stone to designate any particular corner with a contemporaneous assertion, as to how the lines are to run from it, is no identification of land, nor can these acts, in the very nature of things, give it any known or certain locality. I repeat, that if there was full proof of the act of planting a stone, or erecting a monument, it was an illegal act, and severed no land from the royal domain. The concession required a survey, a process verbal of it and its return, not the planting of a stone; and therefore the proceedings of the commandant, said to have been adopted to designate the lands granted, were not only in violation of the plain requisitions of the concession itself, but were not sanctioned by any of the ordinances, orders, or regulations of the Spanish government. If a survey could have been dispensed with, it is reasonable to infer that it would have been done in the concession itself, and that planting a stone, or some such act, would have been substituted in its place. But this is not the case, and indeed so far from it, a survey and the return of it are clearly contemplated, and upon that the proper title was to be furnished to the grantees in form.

The Baron De Carondelet, plenary as his powers may have been, was subordinate to the king, and was obliged to observe his royal ordinances and orders. As governor-general, he had no dispensing power; and to say nothing of the insuperable difficulty of locating a tract of land of a million of arpens by the mere erection of a monument as a corner, it is sufficient to observe that he had not authority to dispense with a survey of the land in a case like this, and that it would have been illegal to do so; and there is perhaps no better proof of it than the fact that this proceeding, said to have been officially reported to the Baron De Carondelet, must, if so reported, have been regarded by him as illegal, and as a departure from the concession; for otherwise the presumption is almost irresistible, that the title in form promised in the concession would have been furnished to the grantees, and more especially as Elisha Winter was said to have been on terms of intimacy with the baron, and to have been in New Orleans much of his time between 1798 and 1800. In my judgment, it was a condition that the grant should be surveyed, and without it the grantee could not be said to be established on any specific land; he could not be said to have the legal seizin or possession of any specific land (U. S. v. Lawson, 5 How. [46 U. S.] 29); and therefore I disregard all the proof respecting the occupation by the Winters of a tract of land near the post of Arkansas, which they claimed as a grant from the Spanish government, as being entirely irrelevant.

But it is urged upon me that conditions were inserted in Spanish grants as a mere matter of form; that a compliance with them was not required; that there are no instances where grants have been declared forfeited for a non-compliance with conditions; that the hostility of the Indians would have prevented an actual survey, and that there was no surveyor at the post of Arkansas. As to danger from Indians, it may be replied, in the spirit of the decision of the supreme court in the case of U. S. v. Kingsley, 12 Pet. [37 U. S.] 484, on a similar occasion, that a grantee cannot be permitted to urge as an excuse in fact or in law, for

not complying with his undertaking, a danger which applies as forcibly to repudiate the sincerity of his intention in asking for the grant, as it does to his inability from such danger to execute it afterwards. And as to there being no surveyor at the post in the district of Arkansas at the time, it was a fact which he must be presumed to have known at the date of the concession, and cannot therefore be permitted to derive any advantage from that circumstance; nor was he confined to the district of Arkansas in obtaining a surveyor. It was imposing no extraordinary hardship, and was indeed asking but little at his hands, to require a survey of this enormous gratuity.

Now as to conditions being inserted in Spanish concessions as matters of form only, it seems to me to be a singular position to assume before a judicial tribunal, and not less singular that proof of it should be adduced. If I am at liberty to disregard certain parts of this concession as being formal and not requiring observance, may I not with the same propriety reject the whole? And is this to be a rule in this kind of cases, and to form a landmark in their adjudication? Judicial decisions would then depend upon the integrity and intelligence of witnesses, not on the written law, and would vary as often as the opinions of men. Such proof can have no weight with me, because of its uncertainty, and because it contravenes known regulations and laws which existed in the province of Louisiana, and which I prefer as guides to the loose declarations of witnesses of whom we know nothing.

While upon this point, I will also add, that if it was the usage at the post of Arkansas to designate lands by merely fixing some corner thereto, it was a usage repugnant and contrary to express written law, and therefore void. 1 Bl. Comm. 77; 3 Term R. 271. No usage or custom can prevail against an express act of the lawmaking power. If the performance of conditions was not required, they would hardly have been inserted; and the fact that surveys and occupation were required by the terms of almost every concession, are conclusive proof that so far from being matters of form, they were really matters of the first consequence, and indicated the permanent establishment of the only certain system of separating private grants from the public domain. According to my recollection, the civil law used in Spain, and introduced into the province of Louisiana, was equally as strict as the common law with regard to exacting a compliance with conditions, and as rigidly excluded parol proof, either to change, vary, modify, or annul, or in any manner affect such conditions. Code Nap. b. 3, c. 4, § 1. But what perhaps is more to the purpose, the supreme court has held that conditions could not be dispensed with, but must be performed. U. S. v. Kingsley, 12 Pet. [37 U. S.] 486.

There are other points that might be noticed, but it is not necessary; and in closing this opinion, I will adopt the language of the supreme court in Lawton's Case, 5 How. [46 U. S.] 28, as applicable on the present occasion. This concession, in its leading features, cannot be distinguished from various others, where no specific land was granted, or intended to be granted; but it was left to the grantee to have a survey made of the land in the district referred to by the concession by some person properly authorized, by which additional act the land granted would have been severed from the king's domain, and have become private property. Let the claim be rejected, and the petition be dismissed, at the costs of the petitioners. Ordered accordingly.

NOTE. The cases of Heirs of William Winter, Deceased, v. United States, and Gabriel Winter v. United States, for 250,000 arpens each, depending upon the same facts and principles, were severally argued by Daniel Ringo, for the petitioners, and S. H. Hempstead, Dist. Atty., for the United States, in conjunction with the preceding case; and, under the foregoing opinion, the claims were severally rejected, and the petitions dismissed. In each of the three cases appeals to the supreme court were prayed and granted, but never prosecuted any further, and were abandoned. The case of Putnam v. U. S. [Case No. 11,484], claiming under Elisha Winter by conveyances, was dismissed.